In re Gary LAZAR and Divine Grace Lazar, Debtors.

In re CALIFORNIA TARGET ENTERPRISES, INC., et al., Debtors.

George E. SCHULMAN, Chapter 7 Trustee, Plaintiff/Petitioner,

v.

CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, et al., Defendants/Respondents.

Bankruptcy Nos. LA 92–39039SB, LA 92–39042 SB.

Adv. No. LA 96–01575 SB.

United States Bankruptcy Court, C.D. California.

Sept. 3, 1996.

**364**

David Gould, Mary Ellen Hogan, McDermott, Will & Emory, Los Angeles, CA, for debtors.

Daniel E. Lungren, Attorney General of the State of California, Charles W. Getz, IV, Assistant Attorney General, William S. Abbey, Deputy Attorney General, Los Angeles, CA, for California State Water Resources Control Board.

## OPINION ON MOTION FOR REMAND OR ABSTENTION

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

This adversary proceeding raises the issue of whether a chapter 7 trustee can be compelled to litigate in state court the denial of his administrative claim filed against the California Underground Storage Tank Cleanup Fund ("the Fund"), where the denial was based on the prepetition misconduct of the debtors, and the state has filed a claim for unpaid taxes to support this fund and has otherwise taken an active role in this case. The Court holds that the state's motion to remand this proceeding to state court must

be denied. The police power disqualification for removal does not apply, because the removed action is not an action *by* the state, and it does not involve the exercise of its police or regulatory power. This proceeding is not subject to mandatory abstention, because it involves a core proceeding under the Bankruptcy Code, and it does not raise purely state law questions. The factors relevant to discretionary abstention weigh substantially against such abstention, and equitable grounds also weigh substantially in favor of denying the motion.

In addition, the Eleventh Amendment does not deny this Court jurisdiction to hear this proceeding, because the state has waived its sovereign immunity rights thereunder in two respects. First, it has filed claims that are logically related to this proceeding such that this proceeding arises out of the same transaction or occurrence, within the meaning of Bankruptcy Code § 106(b). Second, the state has made a general appearance in this case, which waives its right to object to this Court's exercise of jurisdiction over it based on the Eleventh Amendment.

### II. Relevant Facts

#### A. The Underlying Bankruptcy Cases

The underlying bankruptcy cases are nine substantively consolidated cases filed by corporations under the control of Divine Grace Lazar and Gary Lazar, which are jointly administered with the personal case of the Lazars. Prior to the filing of the cases, the Lazars and their entities held interests in some 200 retail gasoline stations in Southern California, which the entities owned, operated or leased. The Lazars filed their joint case and eight of the corporate cases under chapter 11 in July, 1992, when the State of California seized the debtors' bank accounts for nonpayment of gasoline taxes, including the taxes imposed for contributions to the fund at issue in this motion. The final corporate case, which is substantively consolidated with the others, was filed approximately a year prior to the other cases.

George Schulman was appointed as chapter 11 trustee by the district court in September, 1994, during a brief period of time when the reference of the case to the bank-

ruptcy court had been withdrawn. The corporate cases were subsequently substantively consolidated and ordered jointly administered with the Lazar individual case. A year later the cases were converted to cases under chapter 7, and Schulman was appointed as the chapter 7 trustee.

The Lazars were apparently some of the worst actors in the petroleum industry. Each is now serving an eight-year sentence for environmental crimes in connection with the operation of the gasoline stations. In fact, they were the first ever to be prosecuted for the criminal violation of the California environmental laws.[1] In addition, each is under indictment for federal crimes arising out of the same conduct and for the underreporting of federal gasoline taxes. On the state charges, the corporations have been fined a total of $400 million. Furthermore, Texaco appeared early in this case and claimed that the debtors were selling adulterated gasoline at branded Texaco stations:[2] this controversy was resolved when the debtors gave up the Texaco brand rights.

Leaking tanks at retail gasoline stations constitute one of the most serious environmental problems in the United States. Prior to the 1990's, gasoline stations installed single-hulled tanks, which tended to rust and develop leaks as they aged. More recently, double-hulled tanks, which are much less prone to leakage, have been required. The leaking of older gas tanks has rendered virtually every gas station in the United States an environmental disaster. The Lazar's specialized in the ownership of older stations, which were economically marginal, and where the tanks were especially prone to leakage.

The environmental authorities depend on gas station owners and operators to test their own tanks for leakage and to report the test results to the state. Tanks are tested periodically by pumping a pressurized inert gas into the tanks and waiting a period of time to see whether the pressure holds. If the pressure decreases beyond a certain level, the tanks are diagnosed as leaking tanks and must be replaced at the owner's expense. The honest reporting of the pressure tests is an essential feature of the regulation of environmental hazards at gasoline stations. The Lazars pleaded nolo contendere in a state criminal proceeding to the charge of falsifying the tank tests, and are currently serving eight-year sentences for this conduct.

## B. The Fund

In 1989 the California legislature enacted the Barry Keene Underground Storage Tank Cleanup Trust Fund Act in response to the problem of leaking petroleum underground storage tanks and the threat that they posed to the public health and safety and to the environment. CAL.HEALTH & SAFETY CODE §§ 25299.10–25299.81 (West 1992 & Supp. 1996). This act imposes duties on owners and operators of underground storage tanks, including the duty to investigate the condition of the tanks periodically, and to clean up any leaks into the soil and ground water. Tank owners and operators are also required to establish evidence of financial responsibility for taking such corrective action and for compensating third parties for damage resulting from leaks.

The act also establishes the Fund to assist owners and operators with the costs of corrective action and the compensation of third parties. The Fund may also satisfy the financial responsibility requirements that the law imposes on owners and operators. The Fund is financed by a storage fee imposed on the tank owners for each gallon of gasoline or other petroleum product stored in a permitted tank. The Fund is administered by the State Water Resources Control Board ("SWRCB"), which has adopted regulations implementing and interpreting the statute. See CAL.CODE REGS., tit. 23, §§ 2610–2728 and 2803–2814.3.

The Fund is a reimbursement program. In order to obtain reimbursement from the Fund, or to use the Fund to meet financial

---

1. At the invitation of the Court, the Los Angeles County prosecutor has explained that the Lazars were at the head of the list for prosecution for environmental crimes because of their falsification of gasoline tank test reports.

2. This allegation was also aired by National Broadcasting Company in its "Dateline" news commentary.

responsibility requirements, an owner or operator must meet certain eligibility requirements. CAL.HEALTH & SAFETY CODE §§ 25299.57–25299.58 (West Supp. 1996). The eligibility requirements include an obligation to demonstrate compliance with the statute, and a showing that any unauthorized release of petroleum products did not result from gross negligence, or intentional or reckless conduct by the claimant. *Id.* § 25299.57.

The California State Board of Equalization ("SBE") and the state controller have filed claims in these consolidated cases totaling more than $44 million for unpaid taxes. An unspecified portion of this amount is for taxes payable to the Fund. In addition, California has imposed tax levies against the various debtors, and has appeared frequently in the case to protect its resulting secured claim.

### C. The Adversary Proceeding

In early 1992, some of the debtors filed numerous claims with the Fund, twenty of which are the subject of the underlying administrative action. The trustee inherited these claims when he was appointed in this case. In November, 1994 the SWRCB staff issued a decision denying the claims, and the trustee's administrative appeal has been unsuccessful. The claims were denied on the grounds of misconduct by the Lazars. On March 13, 1996 the trustee filed a petition for a writ of administrative mandamus[3] in the Los Angeles County Superior Court, and on March 21 he removed it to this Court. The State of California now moves this Court to remand this adversary proceeding to the Los Angeles County Superior Court.

### III. Statutory Arguments

The California SWRCB moves to remand this proceeding to the Superior Court on both statutory and constitutional grounds. The Court reserves the constitutional issue until last, on the grounds that it should not be addressed if there is an adequate non-constitutional basis for its decision.

The California SWRCB argues for remand on four separate statutory grounds. First, SWRCB contends that this adversary proceeding is not removable from state court, because it concerns the enforcement of the state's police or regulatory power. Second, SWRCB argues that this adversary proceeding is subject to mandatory abstention, and thus must be remanded. Third, SWRCB claims that the proceeding qualifies for discretionary abstention, which should be granted in this case. Fourth, SWRCB contends that equitable considerations compel the remand of this adversary proceeding to state court. The Court finds each of these arguments unpersuasive.

### A. Police Power

■ Removal from state court to bankruptcy court and remand back to state court is governed by 28 U.S.C.A. § 1452 (West 1994). Section 1452(a) provides:

A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

Section 1334[4] is the general grant of bankruptcy jurisdiction to the district courts. Pursuant to 28 U.S.C.A. § 157(a),[5] each district is authorized to adopt a general order of reference to send all bankruptcy cases to the bankruptcy judges for the district, and in fact all districts (including this district) have so ordered. Thus the removed action from the state court came to this Court.

The SWRCB contends that this is an action to enforce its environmental laws, and

---

**3.** Administrative mandamus is the procedure prescribed by the California Code of Civil Procedure for challenging a state or local government administrative action. *See* CAL.CIV.PROC.CODE § 1094.5 (West Supp.1996). *See generally,* CALIFORNIA ADMINISTRATIVE MANDAMUS (2d ed. 1989 & Supp.1994).

**4.** 28 U.S.C.A. § 1334 (West 1993 & Supp.1996).

**5.** Section 157(a) provides:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

28 U.S.C.A. § 157(a) (West 1993).

thus constitutes a "civil action ... to enforce [its] police or regulatory power." In consequence, SWRCB argues, the "police or regulatory power" exception in the statute makes this adversary proceeding non-removable. The Court finds this argument unconvincing.

■ To invoke this exception to the removal power, the state must prevail on two points: the action must be brought (1) *by* a governmental unit, and (2) to enforce that governmental unit's police or regulatory power. The Court finds that neither requirement is met in this adversary proceeding.

### 1. Action by a Governmental Unit

■ It is manifest that neither the action in the state court nor the prior administrative application was brought by the SWRCB (or by any other governmental unit). Before these bankruptcy cases were filed, the debtor filed applications with the SWRCB for benefits under the Fund. Upon the bankruptcy filings, the debtor-applicant was succeeded by the debtor in possession, and subsequently by the trustee upon his appointment.

After the Fund denied the applications (which the trustee was then prosecuting), the trustee filed an administrative mandamus proceeding in the Superior Court, and then removed it to this Court. The SWRCB filed no action, not even a counterclaim, in any of the proceedings. In all respects SWRCB was a respondent, not an initiator of any action. Thus this is not an action *by* the SWRCB in any sense.

The SWRCB argues that a finding that this action was not brought by a governmental unit would exalt form over substance, because in substance it involves the state's enforcement of its environmental laws. This argument proves too much. Most actions against a government involve in some manner the government's enforcement of its laws. If the Court were to adopt this argument, the requirement that the action be brought *by* a state would largely disappear. The Court is thus unpersuaded.

### 2. Enforcement of Police or Regulatory Power

The second factor that the state must show, to establish its claim that this action is not removable from state court, is that it involves the state's enforcement of its police or regulatory power. The state fails in this regard, also.

■ Outside of bankruptcy, the police and regulatory powers of government are construed very broadly. As the United States Supreme Court has stated, "the police power, in its broadest sense, includes all legislation and almost every function of civil government." *Sligh v. Kirkwood,* 237 U.S. 52, 59, 35 S.Ct. 501, 502, 59 L.Ed. 835 (1915). The Supreme Court has further stated, "[i]t is the most essential of powers, at times the most insistent, and always one of the last limitable powers of government." *Eubank v. Richmond,* 226 U.S. 137, 142–43, 33 S.Ct. 76, 77, 57 L.Ed. 156 (1912) (citation omitted).

Where the police and regulatory powers come into conflict with the bankruptcy powers, however, they cannot be construed so broadly. This broad scope of the police power may conflict with the priority scheme that Congress has established for a liquidation bankruptcy, and may upset the timing in a reorganization case. Thus two different federal interests are in competition in a bankruptcy case, and the exercise of the constitutional bankruptcy power in the federal courts must be reconciled with the state's exercise of its police power. Where two constitutional interests come into conflict, each must be narrowed to a provide for the other.

### a. Case Law Interpreting § 1452(a)

There is little case law interpreting the "police or regulatory power" language in § 1452(a). The Court has found only three such reported opinions.

The most analogous reported opinion is *Ohio ex rel. Fisher v. Forster (In re Forster),* 146 B.R. 383 (Bankr.N.D.Ohio 1992), where the bankruptcy court remanded to state court a state action to require the debtor to comply with certain environmental laws and to recover costs resulting from violations thereof. The remanding court found that this enforcement of environmental statutes and regulations constituted an exercise of regulatory power. *Id.* at 384.

However, *Forster* involved very different facts from those in this case. This case does

not involve the debtor's compliance with environmental laws, the state's enforcement of such laws against an unwilling debtor, or recovering costs for violation thereof. Instead, it involves the debtor's qualification for benefits from a fund established to assist gasoline station owners in complying with environmental regulations. Furthermore, the matter comes to this Court only in an administrative mandamus action following an adverse administrative decision against the debtor. *Forster,* in contrast, was an action by the state to obtain injunctive relief and damages from the debtor. Thus *Forster* is not useful in determining whether this matter is removable to this Court.

The Court has found two other cases, quite different from this case, which apply the "police or regulatory power" exception to § 1452(a). In these two cases, courts found that removal was prohibited by the police or regulatory power provision: *Departmental Disciplinary Comm. v. Shapiro (In re Friedman & Shapiro),* 185 B.R. 143 (S.D.N.Y. 1995) (attorney disbarment action); *In re Rabzak,* 79 B.R. 966 (Bankr.E.D.Pa.1987) (prosecution for dumping refuse and rubbish in violation of township ordinance). The courts in both of these cases found it unnecessary to engage in any detailed analysis to arrive at their conclusions (apparently because the outcome was so obvious), and the opinions provide little help in determining the appropriate scope of the police or regulatory of government in this context.

**b. Case Law Interpreting Same Language in § 362(b)(4)**

■ There is another possible source of assistance in interpreting the "police or regulatory power" exception to removability. This same language is used in Bankruptcy Code § 362(b)(4) to describe an exception to the automatic stay of § 362(a) that results from the filing of a bankruptcy case. The "police or regulatory power" language is construed narrowly in § 362(b)(4).

First, a note of caution. Care must be used in relying on a different Bankruptcy Code provision using the same language, in light of the holding of the United States Supreme Court that the same language used even in different subsections of the same

section of the Bankruptcy Code may not have the same meaning. *Dewsnup v. Timm,* 502 U.S. 410, 417–20, 112 S.Ct. 773, 778–80, 116 L.Ed.2d 903 (1992) (holding, based on pre-Code rule, that "allowed secured claim" in § 506(d) has different meaning from that in § 506(a), where contrary interpretation would mark a major change in pre-Code practice and legislative history was silent on subject).

The analysis of the scope of the police or regulatory power exception to § 362(a) begins with the legislative history of § 362(b)(4) and (5). The House Report states:

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory power. Thus, where a governmental unit is suing a debtor to prevent or stop violation for fraud, environmental protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay. Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment.

S.Rep. No. 989, 95th Cong., 2d Sess. 52 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838; H.R.Rep. No. 595, 95 Cong., 1st Sess. 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299.

The circuits are divided on the scope of the police or regulatory power exception, and the Ninth Circuit has not taken a position. The First and Sixth Circuits take the more narrow approach, under which the exception applies only where the government is seeking through its action to protect public health, safety, and welfare, and not seeking to protect a pecuniary interest. *Word v. Commerce Oil Co. (In re Commerce Oil Co.),* 847 F.2d 291, 295–96 (6th Cir.1988); *Corporación de Servicios Médicos Hospitalarios v. Mora (In re Corporación de Servicios Médicos Hospitalarios),* 805 F.2d 440, 445 n. 4 (1st Cir.1986). In contrast, the Eighth Circuit takes a slightly broader approach to the

scope of the exception, and applies it where the state will not obtain a pecuniary advantage, as opposed to a protecting a pecuniary interest. *United States v. Commonwealth Cos. (In re Commonwealth Cos.)*, 913 F.2d 518, 524–25 (8th Cir.1990).

The Ninth Circuit addressed the meaning of the § 362(b)(4) in *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581 (9th Cir.1993), where it stated:

[T]he terms "police or regulatory power" as used in [subsection (b)(4)] refer to the enforcement of state laws affecting health, morals, and safety but not regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court.

*Id.* at 591 (emphasis in original). In *Hillis* the court held that a state's dissolution of the corporate debtor for failure to satisfy state filing requirements, while the bankruptcy case was pending, was a violation of the automatic stay. Thus the state did not qualify for the § 362(b)(4) and (b)(5) exceptions. Neither the facts of the *Hillis* decision nor the Ninth Circuit's language in deciding the case provide much assistance in deciding the case before the Court. Furthermore, the *Hillis* decision does not assist in choosing between the broader or the narrower interpretation of the § 362(b)(4) exception.

The reported opinion most similar to this proceeding is *In re Psychotherapy & Counseling Center, Inc.*, 195 B.R. 522 (Bankr. D.D.C.1996), where the court found that an action to exclude a health provider from a provider payment program administered by the Department of Health and Human Services did not qualify for the § 362(b)(4) exception to the automatic stay. The court arrived at this conclusion notwithstanding its adoption of the broader "pecuniary advantage" interpretation of the exception.

### c. Construction of § 1452(a)

The narrow construction of the police or regulatory power exception to the automatic stay (under either of its formulations) does not necessarily apply to § 1452, the removal statute. The contexts are quite different, and may call for different interpretations of the two statutory provisions.

However, there are two grounds for giving these two provisions the same interpretation. If the scope of the police or regulatory power is the same in the two provisions, then an action as to which the state has a right to proceed in state court (because it is excepted from the automatic stay) would also not be subject to removal. At the same time, any action that is subject to the automatic stay would be removable to federal court, where the bankruptcy court would determine whether the action should proceed, in view of the status of the bankruptcy case. Under this construction of the law, a state court would be called upon to decide the applicability of the automatic stay to this issue only where no party exercises the option to remove a properly removable action to bankruptcy court. This would ease the burden on state courts to interpret a highly complex bankruptcy law provision for which state judges normally have little background, experience or resources.

■ There is a second reason for construing narrowly the § 1452 exception to removability, where the action arises from the state's exercise of its police power. One of the important policies of the Bankruptcy Code, in contrast to the former Bankruptcy Act, was to eliminate the piecemeal litigation of matters relating to a bankruptcy case in various courts, and to concentrate them in the bankruptcy court. *See, e.g., Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 87 n. 40, 102 S.Ct. 2858, 2880 n. 40, 73 L.Ed.2d 598 (1982). Thus, for example, the Bankruptcy Code eliminated the previous distinction between summary jurisdiction (which a bankruptcy judge could exercise) and plenary jurisdiction (which could only be exercised by other courts). *See generally* 1 COLLIER ON BANKRUPTCY ¶ 3.01.[1][b][iv] (Lawrence P. King, ed. 15th ed. 1996).

■ This Congressional intention has been eroded to a certain extent by subsequent Supreme Court decisions, most notably *Northern Pipeline, supra* (holding that bankruptcy judges, lacking lifetime tenure under Article III of the United States constitution, may not constitutionally decide a contract action that, absent bankruptcy, would be liti-

gated in a non-bankruptcy court); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (holding that a defendant in a preference action under Bankruptcy Code § 547 has a right to a jury trial); and *Seminole Tribe v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1134, 134 L.Ed.2d 252 (1996) (holding that Congress lacks authority under the Indian Commerce Clause to authorize suits against states in federal court in abrogation of their Eleventh Amendment immunity). However, this Court should not contribute to this erosion of bankruptcy court jurisdiction where it is not compelled by statute or the constitution.

■■■ For the foregoing reasons the Court holds that the § 1452(a) police or regulatory power exception to the removability of actions to federal court must be read narrowly, to permit the effectuation of the bankruptcy policy of determining all issues relating to a bankruptcy case, insofar as the Constitution permits, in a single forum (the bankruptcy court). This narrow reading construes the meaning of "police power" in the § 1452(a) exception to removability the same as its construction in the § 362(b)(4) exception to the automatic stay.

■■■ Given this narrow construction of the police or regulatory power in this context, the Court concludes that this adversary proceeding does not involve California's exercise of such power. Like *Psychotherapy, supra,* this case involves solely the right to receive benefits from a fund established with money collected from the debtor entities, and from others similarly situated, for the reimbursement of expenses arising out of the conduct of the business of the debtors in this case.

The Court finds it unnecessary in this case to choose between the two interpretations of the police or regulatory power applicable in the § 362(b)(4) context. This action does not involve the police or regulatory power of state government in either sense. Instead, it involves the eligibility to benefit from a government funding program established with taxes paid by the debtor and others similarly situated. The denial of such benefits is in both the pecuniary advantage and the pecuniary interest of the state, because it re-

serves more funds for other claimants against the Fund, and thereby reduces the tax burden that the state must impose to satisfy claims against the Fund.

The Court finds that the determination of the qualification for benefits from the Fund does not involve the exercise of the police power in the narrow sense required for the application of § 1452(a).

## B. Mandatory Abstention

Mandatory abstention in a bankruptcy case is provided in 28 U.S.C.A. § 1334(c)(2), which states:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C.A. § 1334(c)(2) (West Supp.1996). Under a general order of reference pursuant to § 157(a), § 1334(c)(2) applies to a proceeding in bankruptcy court.

■■■ Mandatory abstention requires a finding of the following elements: (1) a timely motion; (2) a purely state law question; (3) a non-core proceeding that is merely a proceeding related to a bankruptcy case; (4) no basis for federal jurisdiction apart from the bankruptcy case; (5) a pending action in state court; (6) the state court action can be timely adjudicated; (7) appropriate jurisdiction exists in the state forum. *Sedlachek v. National Bank (In re Kold Kist Brands, Inc.),* 158 B.R. 175, 178 (C.D.Cal.1993). It appears that the first, fourth, fifth and seventh elements are met in this case. Further discussion is required for the second, third and sixth elements.

### 1. Timely Adjudication

■■■ Most mandatory abstention motions in this Court falter on the requirement that

the action "can be timely adjudicated" in state court. Since time immemorial the Los Angeles County Superior Court has not had nearly enough judges to handle the caseload pending in that court. When I practiced in that court in the early 1980's, only five-year-old civil cases were going to trial, and they were being tried only because California law requires a plaintiff to bring a case to trial in that time. *See* CAL.CIV.PROC.CODE § 583.310 (West Supp.1996). More recently, the Los Angeles County Superior Court has been overwhelmed with criminal drug cases, and in the last two years with the "three strikes" criminal law initiative, which mandates much longer sentences for criminals with prior convictions of more serious crimes.[6] *See, e.g., L.A. Courts Staggering Under '3–Strikes' Load,* L.A. TIMES, Dec. 11, 1995, B4; Stephanie Simon, *Civil Courts Also Feel Squeeze of '3–Strikes' Cases,* L.A. TIMES, Aug. 13, 1995, A1. The prospects of the appointment of enough judges in that court to handle its caseload in the foreseeable future are quite dim.

However, an administrative mandamus action does not stand in line for five years with other civil cases in the Los Angeles County Superior Court. It goes directly to Department 86 in downtown Los Angeles (in which I spent considerable time as an attorney), where it is resolved expeditiously, based on the administrative record. This procedure clearly qualifies as timely adjudication within the meaning of § 1334(c)(2).

### 2. Purely State Law Question

 The principal reason that mandatory abstention falters is that this adversary proceeding does not involve a purely state law question. To be sure, the claims against the Fund were filed prior to the bankruptcy cases, and arose purely under state law. They were brought by entities that had no need of bankruptcy assistance to make their cases. Furthermore, the substitution of the debtor in possession, and then in turn the

trustee, as the claimant did not change this situation.

What changed after the bankruptcy filing is that the controlling issue now appears to be whether the Bankruptcy Code gives to the trustee a status with respect to the prosecution of claims that the prepetition debtors lacked. This aspect of the dispute is unique to the bankruptcy process.

The bankruptcy estate is a different entity from the prepetition debtors. *See, e.g., In re Powell,* 187 B.R. 642, 647 (Bankr.D.Minn. 1995); *In re DeLuca,* 142 B.R. 687, 691 (Bankr.D.N.J.1992); *In re Strangis,* 67 B.R. 243, 246 (Bankr.D.Minn.1986). In many respects the trustee stands in the shoes of the creditors, rather than those of the debtors. For the purposes of this motion, the Court assumes that the prepetition debtors engaged in conduct which disqualified them from receiving benefits from the Fund, and that their applications would have been properly denied. However, the prepetition debtors may be considered strangers to the trustee, and their misconduct may not disqualify the trustee from receiving reimbursement from the Fund. This power of the trustee arises, if at all, under the Bankruptcy Code, and does not exist outside of bankruptcy. Whether the trustee enjoys such a status different from the prepetition debtors goes to the merits of the administrative mandamus action, which is not yet before the Court.

The SWRCB candidly admits that its rejection of the claims is punitive in nature. Because of the trustee's status as the representative of the creditors, who did not engage in any of the Lazars' wrongful conduct, it may be particularly inappropriate to punish the trustee and the creditors whom he represents for this conduct. The Lazars will receive no assets from these consolidated estates, except in the remote contingency that they should turn out to be solvent. The recent criminal fine of $400 million imposed

---

6. The California Supreme Court has recently recognized greater discretion for judges in applying the three strikes law. *People v. Superior Court (Romero),* 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 (1996). However, this alone will require the review of as many as 10,000 sentences under the old standards in Los Angeles County. *See, e.g.,* Michael D. Harris, *Judges Sought more Help on Strikes Ruling,* LOS ANGELES DAILY JOURNAL, August 23, 1996, at 1. This will contribute substantially more work to the already overwhelmed Superior Court.

on the debtor corporations renders this possibility highly remote.

If the Court's surmise is correct, the application of state law will be simple. This will not be a matter where state law issues predominate over bankruptcy law matters. The administrative proceeding will be remanded to the SWRCB for a new determination based on the findings and legal conclusions outlined here. This will not involve any difficult or unsettled state law determinations, and this decision will be based principally upon a determination of the relevant bankruptcy law.

Because of the SWRCB's determination that the trustee is disqualified from receiving benefits under the Fund, in consequence of wrongful conduct by the Lazars before the bankruptcy cases were filed, this proceeding no longer involves purely state law issues.

### 3. Core Proceeding or Related Proceeding

■■■■ Section 1334(c)(2) divides bankruptcy proceedings into three categories: (1) those that are "related" to a bankruptcy case, but which could have been filed in a state court absent a related bankruptcy case, (2) those "arising under" the Bankruptcy Code, and (3) those "arising in" a bankruptcy case. The second and third categories are proceedings for which there is no basis for federal jurisdiction apart from the bankruptcy case itself.[7] The second and third categories, proceedings "arising under" the Bankruptcy Code or "arising in" a bankruptcy case, are those that are designated as "core proceedings" under 28 U.S.C.A. § 157(b). *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987). Under § 1334(c)(2), a related proceeding may be subject to mandatory abstention, if the proper conditions are met.

The fact that the proceeding raises state law issues does not require a determination that the matter does not fall within the core jurisdiction of the bankruptcy court. Section 157(b)(3) specifies:

A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

28 U.S.C.A. § 157(b)(3) (West 1993).

For the reasons stated in the previous section, this is a core proceeding, because it "concern[s] the administration of the estate," within the meaning of 28 U.S.C.A. § 157(b)(2)(A). Thus the Court finds that this is a proceeding that arises under the Bankruptcy Code, within the meaning of § 1334(c)(2), and is a core proceeding.

Thus the Court holds that mandatory abstention must be denied on two grounds: first, this proceeding does not present a purely state law question; second, it is a core proceeding within the jurisdiction of the bankruptcy court.

### C. Discretionary Abstention

■■■■ Discretionary abstention is provided by 28 U.S.C.A. § 1334(c)(1), which states:

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C.A. § 1334(c)(1) (West Supp.1996). This provision applies to the bankruptcy court following reference of a case thereto. This statute gives a bankruptcy court broad discretion to abstain from hearing a matter and to remand it to state court.

■■■■ Under Ninth Circuit law, the Court should consider twelve factors in determining whether to exercise discretionary abstention:

(1) The effect or lack thereof on the efficient administration of the estate if a court recommends abstention; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court; (5) the jurisdictional basis, if

---

7. A third category of case, one which could be brought in a federal court because there is an independent basis for federal jurisdiction, is unaffected by § 1334(c)(2), and is not subject to mandatory abstention.

any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of [the bankruptcy court's] docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of nondebtor parties.

*Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.),* 912 F.2d 1162, 1167 (9th Cir.1990); *accord, Eastport Associates v. Los Angeles (In re Eastport Associates),* 935 F.2d 1071, 1075 (9th Cir.1991). No single factor is dispositive, and the decision does not turn on a counting of the number of factors on each side. Rather, a court must consider each of the factors and the evidence relating thereto, and weigh its importance in the decision on discretionary remand.

■■ We begin with the factors favoring remand to the state court. The Court finds three such factors, factors four, five and ten. First, this proceeding was commenced in state court, and it was the trustee who brought it there. He did so because he thought that he could not bring it in this Court in the first instance. The California Code of Civil Procedure authorizes an aggrieved party to challenge a state administrative action in a superior court, but there is no provision for such a challenge in a bankruptcy court. Second, there is no jurisdictional basis for this action in this Court apart from § 1334. Third, the Court has a suspicion that the trustee would rather litigate this dispute in this Court rather than in the state court, and that the removal to this Court reflects a measure of forum shopping. These factors must be given some weight in the

evaluation of the propriety of discretionary abstention.

The other nine factors, however, weigh on the side of denying abstention, and rejecting the motion to remand. There is no right to a jury trial in this matter, and there are no third parties involved. The Court has already found that this matter is a matter arising under the Bankruptcy Code.

The efficient administration of the estate is a matter of some concern to the Court. This is a case that requires half a day of the Court's time every month. Among the Court's 3691 presently pending cases,[8] it has no other case that requires such a large measure of judicial attention. So long as a matter is pending in this Court, this Court has control over the timing of its resolution. The problem with sending a matter to another court is that this Court loses control over the timing of the case, and it may be delayed for reasons totally beyond this Court's control.

This Court has prior experience with such problems. For example, in *Kipperman v. Kidder Peabody & Co. (In re Tre Scalini),* 178 B.R. 237 (Bankr.C.D.Cal.1995), this Court approved a stipulation for arbitration of a securities claim against Kidder Peabody on the assumption that the arbitration would proceed promptly. However, after two years the arbitration had not even begun. The Court thus was required to revoke the assignment of the matter to arbitration, so that it could be disposed of promptly by way of summary judgment. While the Court is aware that administrative mandamus matters are normally handled promptly in Department 86, a denial of abstention would assure that a similar problem of delay does not arise in this matter.

The burden on this Court's docket does not weigh in favor of remand. While this Court has 3691 pending cases and 478 pending adversary proceedings, its docket is totally current. If the Court were to set for trial next Monday morning all matters on its calendar

---

**8.** For those not familiar with bankruptcy practice, this adversary proceeding does not count as one of this Court's 3691 cases. While it was a case in the Superior Court, it is categorized here as an adversary proceeding in the consolidated corporate cases. In addition to its 3691 cases, this Court has 478 pending adversary proceedings relating to those cases, including five in these consolidated cases.

that are ready for trial, and put this matter on the bottom of the list, it would be the second matter called. This state of the calendar is typical: it is rare for this Court to have more than one trial ready at a time. In addition, the Court operates its law and motion calendar on a weekly cycle, and the Court rules from the bench in approximately 99.9% of its hearings. The only limit on the scheduling of hearings (subject to the 21-day notice requirements of the local rules) is the Court's schedule. This matter can be heard as soon as it can be calendared. Thus, hearing this administrative mandamus proceeding will not burden this Court's docket.

Furthermore, this matter is central to this bankruptcy case. The trustee asserts that this is his largest opportunity to recover assets on behalf of the creditors, and the successful resolution of this matter could easily determine whether there are any substantial assets to distribute to creditors. The state does not dispute this contention.

We arrive finally at the most important consideration with respect to discretionary abstention. As pointed out above, it appears to the Court that the SWRCB may have erred in failing to treat the trustee as a separate party from the debtors, who does not inherit their disqualification from participating in the Fund. As a preliminary matter, it appears that this issue could be the controlling issue of law.

On balance, the Court concludes that the factors weighing against abstention substantially outweigh the factors in its favor. Insofar as the motion seeks discretionary remand, it is denied.

### D. Equitable Grounds

SWRCB's final statutory argument is that the Court should remand this matter to state court on equitable grounds. The bankruptcy removal statute, § 1452(b), provides:

> The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground.

28 U.S.C.A. § 1452(b) (West 1994).

The factors that courts consider in deciding whether to remand on equitable grounds are essentially the same as those previously considered under discretionary abstention. *See, Drexel Burnham Lambert Group, Inc. v. Vigilant Insurance Co.,* 130 B.R. 405, 407 (S.D.N.Y.1991); *Republic Reader's Service, Inc. v. Magazine Service Bureau, Inc. (In re Republic Reader's Service, Inc.),* 81 B.R. 422, 429 (Bankr.S.D.Tex.1987) (listing five factors). Thus, for the reasons stated in considering that issue, the Court finds that the equities in this case favor a denial of the remand motion.

### IV. Eleventh Amendment

Having found no statutory or equitable grounds to abstain or to grant SWRCB's motion to remand, the Court must consider the constitutional issue: whether this Court is precluded by the Eleventh Amendment from exercising jurisdiction over this action. The parties apparently agree, and the Court assumes, that the Fund is an arm of the state within the meaning of the Eleventh Amendment.

There is a substantial tradition of the exercise of bankruptcy court jurisdiction over disputes involving state governments, which has developed since the effective date of the Bankruptcy Code on October 1, 1979. *See, e.g., California Department of Health Services v. Jensen (In re Jensen),* 995 F.2d 925 (9th Cir.1993) (adversary proceeding brought by debtor against state); *Torwico Electronics, Inc. v. New Jersey (In re Torwico Electronics, Inc.),* 8 F.3d 146 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994) (debtor action against state agency to prohibit imposition of cleanup obligations); *Wilner Wood Products Co. v. Maine,* 128 B.R. 1 (D.Me.1991) (bankruptcy court lacks power to enjoin state environmental authority from denying application for air emission license, because debtor must comply with environmental laws). However, this tradition has recently been called into question by the United States Supreme Court in *Seminole Tribe v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Accordingly, we must examine the Supreme Court's decision to determine the appropriate application of the Eleventh Amendment in this context.

## A. *Seminole Tribe*

The Eleventh Amendment to the United States Constitution has recently received a new jolt of energy in consequence of the *Seminole* decision, where the Court found that the Eleventh Amendment barred an Indian tribe from bringing an action against the State of Florida in federal court under the Indian Gaming Regulatory Act. This act required a state to negotiate with an Indian tribe for the purpose of entering into a tribal-state compact governing the conduct of certain gambling activities on an Indian reservation, and authorized a tribe to sue a state in federal court to compel such good faith negotiation. The Supreme Court found that such a suit violated the Eleventh Amendment's grant of immunity to states from suit against them in federal court.

The Eleventh Amendment states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although the text of the amendment would appear to apply only where the citizenship of the plaintiff is diverse from that of the defendant state, the Supreme Court in *Seminole* adopted the historical view that the amendment recognizes two aspects of state sovereignty: (1) each state is a sovereign entity in the federal system of the United States; and (2) "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Id.* at ——, 116 S.Ct. at 1122. The Supreme Court held: "Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Id.* at ——, 116 S.Ct. at 1131. Because Florida had not consented to be sued in federal court on this issue, the Supreme Court found that federal jurisdiction over the dispute was barred by the Eleventh Amendment.

In the *Seminole* decision, the Supreme Court expressly overruled its prior decision in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), where it had held that a federal court may order a state to pay environmental cleanup costs pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"). In a decision lacking a majority opinion, the Court concluded in *Union Gas* that Congress had the authority under Article I of the Constitution to abrogate the states' Eleventh Amendment immunity that would otherwise prohibit a federal court from issuing such an order.

In *Seminole* the Supreme Court held that the Eleventh Amendment prevents Congress, acting pursuant to its Article I powers, from subjecting unconsenting states to suits brought by private parties in federal court. —— at ——, 116 S.Ct. at 1131. The majority took a broad view of the Eleventh Amendment, and interpreted it to impose state sovereign immunity as a limitation on the entirety of the federal judicial power under Article III. *Id.*, at —— – ——, 116 S.Ct. at 1131–32.

Justice Stevens took specific note of the broad reach of the Court's language, and its possible impact in bankruptcy cases, in his dissent in *Seminole*. He stated:

The importance of the majority's decision to overrule the Court's holding in *Pennsylvania v. Union Gas Co.* cannot be overstated. The majority's opinion does not simply preclude Congress from establishing the rather curious statutory scheme under which Indian tribes may seek the aid of a federal court to secure a State's good faith negotiations over gaming regulations. Rather, it prevents Congress from providing a federal forum for a broad range of actions against States, from those sounding in copyright and patent law, to those concerning bankruptcy, environmental law, and the regulation of our vast national economy.

*Id.*, at ——, 116 S.Ct. at 1134. In the majority opinion, Chief Justice Rehnquist responded to this criticism in a curious fashion:

[I]t has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity. This Court never has awarded

relief against a State under any of those statutory schemes.... Although the copyright and bankruptcy laws have existed practically since our nation's inception ... there is no established tradition in the lower federal courts of allowing enforcement of those federal statutes against the States.

*Id.*, at ———-———, 116 S.Ct. at 1131–32 n. 16. As a factual matter, we have seen that Justice Rehnquist was simply wrong insofar as bankruptcy is concerned: there is a long-standing tradition in the bankruptcy courts, dating back to 1979, of allowing the bankruptcy courts to enforce applicable law against the states.

▮▮▮▮▮ *Seminole,* where it is applicable, does not altogether prevent a trustee or debtor in possession from bringing a lawsuit against a state or state agency. Bankruptcy trustees and debtors in possession may sue states and state agencies in state court (as the trustee did in this case before removing it to this Court), with no hindrance from the Eleventh Amendment. *See, e.g., Hilton v. South Carolina Railways Commission,* 502 U.S. 197, 204–05, 112 S.Ct. 560, 564–65, 116 L.Ed.2d 560 (1991); *see generally,* S. Elizabeth Gibson, *Sovereign Immunity in Bankruptcy: The Next Chapter,* 70 Am.Bankr.L.J. 195, 203–08 (1996). State courts are required to enforce applicable federal law in suits brought before them.

In addition, states have generally waived sovereign immunity for most kinds of actions that a trustee may want to bring against them. Under the Bankruptcy Act, a proceeding in state court was frequently required because bankruptcy courts were limited to summary jurisdiction. *See* 1 Collier on Bankruptcy ¶ 3.01.[1][b][4] (Lawrence P. King, ed. 15th ed. 1996). While one of the principal reforms of the Bankruptcy Code was to eliminate this balkanization of bankruptcy jurisdiction, the *Seminole* case may require a limited return to this practice, absent an appropriate waiver.

*Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), also stands in the

way of this court's assertion of jurisdiction over the SWRCB. In *Hans* the Supreme Court determined that a citizen of a state may not prosecute a suit against the citizen's own state in a federal court. The debtor argues that this Court should not follow *Hans,* on the grounds that it is outmoded law that would be overruled by the Supreme Court today. The Court finds to the contrary. The Supreme Court explicitly relied on *Hans* in the *Seminole* decision, and reaffirmed its validity. *Seminole,* —— U.S. at ——, 116 S.Ct. at 1122, 1130. *Hans* clearly remains good law.

## B. Trustee as Federal Official

▮▮▮▮▮ The trustee argues that *Seminole* does not apply to him, because he is a federal agent acting on behalf of the United States Trustee and the bankruptcy court, and not a private citizen subject to the Eleventh Amendment. The Court finds this argument unpersuasive because it would prove too much.

Under this argument, no governmental unit would ever have a sovereign immunity defense to federal jurisdiction in a bankruptcy case, in any action brought by a trustee or a debtor in possession.[9] This would make § 106 largely unnecessary and surplusage, because there would be no need to waive sovereign immunity in the first instance. This is an implausible construction of the role of the trustee.

The United States Supreme Court is in accord. In *California State Board of Equalization v. Sierra Summit, Inc.,* 490 U.S. 844, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989), the Supreme Court held that a bankruptcy trustee, as representative of the estate, was not an arm of the government such that he could avoid the imposition of state sales and use taxes on the sale of assets of the estate. *Id.* at 848–50, 109 S.Ct. at 2231–34. The Court stated:

The bankruptcy trustee is the representative of the estate of the debtor, not an arm of the government, and the tax on the

---

**9.** A debtor in possession in a chapter 11 case enjoys virtually all of the powers of a trustee.

*See* 11 U.S.C.A. § 1107(a) (West 1994).

estate is an administrative expense of the debtor, not of the Federal Government. *Id.* at 849, 109 S.Ct. at 2232–33 (citations and internal quotations omitted). The Court holds that the trustee does not have status as a federal agent that exempts him from the Eleventh Amendment defense to federal jurisdiction.

## C. Waiver

 As the Supreme Court specified in *Seminole,* a state may not invoke sovereign immunity, if it has consented to be sued and has waived its Eleventh Amendment rights. The Court stated explicitly in footnote 14, "this Court is empowered to review a question of federal law arising from a state court decision where a State has consented to suit...." *Id.* at ——— n. 14, 116 S.Ct. at 1131 n. 14.

 State consent to suit may arise by conduct of a variety of sorts. *See generally* 13 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3524, at 160–66 (1984 & Supp.1996). Such a waiver may arise from the filing of a claim in a bankruptcy case, or from making a general appearance in a case. Waiver may also be given in a state statute or constitutional provision. However, the scope of the waiver turns on the nature of the conduct giving rise to it.

The Supreme Court in *Seminole* explicitly reaffirmed the effectiveness of a state's waiver of sovereign immunity, where it is properly accomplished. In the same paragraph where it first quoted the Eleventh Amendment, the Supreme Court began its analysis of the amendment by stating that the amendment's interpretation is based principally on its presupposition of sovereign immunity, which precludes an individual's suit against a state in federal court "without its consent," and precludes such a suit "against unconsenting States." *Id.* at ———, 116 S.Ct. at 1122.

The effectiveness of a waiver has been approved by the Supreme Court in a long line of cases, including *Langenkamp, supra. Seminole,* insofar as this Court can determine, does not call into question this line of authority. It only invalidates, by implication, the effectiveness of the statutory waiver under § 106(b), absent any other grounds for waiver by action of the state itself.

The Court holds that the State of California has waived its Eleventh Amendment rights in this controversy, both by filing claims in this case and by making a general appearance in support of its position as one of the most substantial secured creditors in this case.

### 1. Filing a Claim

 The filing of a claim in a bankruptcy case constitutes a limited waiver of sovereign immunity by a state. When a state files a claim, it waives its sovereign immunity with respect to any claim against it arising from the same transaction or occurrence.

 The conditions for a waiver based on the same transaction or occurrence are specified in the Bankruptcy Code. Section 106(b) [10] states:

> A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same *transaction or occurrence* out of which the claim of such governmental unit arose.

11 U.S.C.A. § 106(b) (West Supp.1996) (emphasis added).[11] Under this provision, the

---

**10.** When the case at bar was filed, the Bankruptcy Code provided:

> A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

11 U.S.C.A. § 106(a) (West 1994). Effective October 22, 1994, Congress amended § 106 in the Bankruptcy Reform Act of 1994, Pub.L. No. 103–

394, 108 Stat. 4106 (1994). The new § 106(b) was essentially a recodification of the prior § 106(a), and did not change its substance.

**11.** In addition, in the Bankruptcy Reform Act of 1994 Congress rewrote § 106(a) so that it explicitly waives sovereign immunity for all governmental units under sixty specified provisions of the Bankruptcy Code. *Seminole* calls into question the validity of this waiver, insofar as it applies to state governments and agencies.

filing of a proof of claim waives that government's sovereign immunity, including its rights under the Eleventh Amendment, with respect to any claim against that government arising out of the same transaction or occurrence.

### a. "Transaction or Occurrence"

■■ The "transaction or occurrence" language of § 106(b) is familiar. It is the same language used in Rule 13(a) of the Federal Rules of Civil Procedure to define the scope of a compulsory counterclaim:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the *transaction or occurrence* that is the subject matter of the opposing party's claim....

FED.R.CIV.P. 13(a) (emphasis added). The Rule 13(a) standards apply for the interpretation of § 106. *Pinkstaff v. United States (In re Pinkstaff)*, 974 F.2d 113, 115 (9th Cir.1992); *United States v. Bulson (In re Bulson)*, 117 B.R. 537, 541 (Bankr.9th Cir. 1990), *aff'd mem.* 974 F.2d 1341 (9th Cir. 1992); *WJM, Inc. v. Massachusetts Department of Public Welfare*, 840 F.2d 996, 1003 (1st Cir.1988). In *Pinkstaff* the circuit court reversed the lower court's holding that an action against the IRS for violation of the automatic stay (by filing a notice of federal income tax lien) arose out of the same transaction or occurrence as the tax claim itself.

■■ What constitutes the same "transaction or occurrence," within the meaning of Rule 13(a), has defied exact definition. *See generally,* 6 WRIGHT, *supra,* § 1410, at 52–65 (2d ed. 1990). The federal courts generally follow the "logical relationship" view, that a transaction or occurrence gives rise to a mandatory counterclaim if it has a logical relationship to that pleaded in a complaint. However, it is necessary to apply this standard with some care, because it could otherwise be expanded to cover all counterclaims. 6 WRIGHT, § 1410 at 65.

Courts are divided on whether the filing of a claim by one state agency constitutes a waiver of Eleventh Amendment sovereign immunity for all other state agencies. Some courts have broadly held that the filing of a claim by one such agency constitutes a waiver of such immunity rights for all state agencies. *See, e.g., Sacred Heart Hospital v. Pennsylvania (In re Sacred Heart Hospital)*, 199 B.R. 129 (Bankr.E.D.Pa.1996); *Hughes–Bechtol, Inc. v. Ohio (In re Hughes–Bechtol, Inc.)*, 124 B.R. 1007, 1018 (Bankr.S.D.Ohio 1991); *Solow v. Greater Orlando Aviation Authority (In re Midway Airlines, Inc.)*, 175 B.R. 239, 244 (Bankr.N.D.Ill.1994). Other courts have held that the waiver resulting from filing a claim is much more narrow. *See, e.g., Rocchio & Sons, Inc. v. Rhode Island (In re Rocchio & Sons, Inc.)*, 165 B.R. 86, 88 (Bankr.D.R.I.1994); *Unicare Homes, Inc. v. Four Seasons Care Centers, Inc. (In re Four Seasons Care Centers, Inc.)*, 119 B.R. 681, 683–84 (Bankr.D.Minn.1990).

This Court does not agree with the broad view of the impact of the filing of a proof of claim by one state agency. The broad view fails to give sufficient weight, in the Court's view, to the "transaction or occurrence" language in § 106(b). Accordingly, the Court must determine whether the trustee's claim against the Fund in this case has a logical relationship to the claim that the State of California has filed for unpaid taxes, including the tax contributions to the Fund.

The Ninth Circuit has taken an expansive view of what constitutes a "transaction or occurrence" under Rule 13(a). However, this view is narrower than that which would find a general waiver of sovereign immunity for the entire bankruptcy case upon the filing of a claim in the case. In *Pochiro v. Prudential Insurance Co.*, 827 F.2d 1246, 1249–53 (9th Cir.1987), the court found that the claims in a lawsuit alleging various abuses by Prudential Insurance against its former insurance salesman, based on a variety of legal

---

However, none of these enumerated provisions appears to be at issue in this adversary proceeding.

Section 106(a) also purports to waive the sovereign immunity of the federal government as to the same Bankruptcy Code provisions. Because

Congress is the legislative authority with the power to grant this waiver, the waiver is effective, if it is done with sufficient specificity. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–39, 112 S.Ct. 1011, 1014–17, 117 L.Ed.2d 181 (1992).

theories, was logically related to Prudential's prior lawsuit against him for misappropriating confidential customer information, and was a compulsory counterclaim that could not be separately litigated.[12] The court also found that the facts underlying the Prudential lawsuit were inextricably wound up with the facts of the related action. *Id.* at 1250. Furthermore, the plaintiff in the second lawsuit had admitted that the judicial resolution of Prudential's claims (in the still-pending Prudential lawsuit) would have a pervasive effect on his own lawsuit, and might even eliminate his claims entirely. The court held that "transaction" is a flexible concept that may comprehend a series of occurrences if they have a logical connection. *Id.* at 1252.

The *Pochiro* case does not set the outer bounds of the "logical relationship" test under Ninth Circuit law. It serves rather as an illustration of what the Ninth Circuit considers to fall within this category, and to show how this test should be applied. Furthermore, the Court notes the impact of the application of the "logical relationship" test in the *Pochiro* case. The plaintiff was precluded from making his claims against Prudential altogether because he had failed to assert them as a counterclaim in Prudential's lawsuit. Where the issue is the waiver of sovereign immunity, different policies may apply. Where, as in this case, the question involves the exercise of federal jurisdiction under the bankruptcy powers, the test should probably be applied more loosely, to facilitate the adjustment of all obligations of a debtor in one forum.

■■■ The Court holds that, given the facts of this particular case, there is such a logical relationship. According to the state, the taxes are imposed specifically to create the Fund, so that money is available to assist underground storage tank owners in cleaning up environmental contamination resulting from tank leakage. The Fund was specifically set up so that the contributors to the Fund would be its beneficiaries. In the Court's opinion, this creates a logical relationship sufficient to qualify as the same "transaction or occurrence" within the meaning of § 106(b).

### b. California's Defenses

SWRCB attempts to avoid this result with three arguments: (1) the claims were filed by different state agencies, and the resulting waiver did not extend to SWRCB; (2) the waiver was not truly voluntary, because the state was compelled to file a claim to participate in the distribution of the bankruptcy estate; and (3) § 106 as amended is still unconstitutional, in light of *Seminole.* The Court finds none of these arguments persuasive.

### i. Filing by Different State Agencies

It is true that SWRCB did not file a claim in this case. However, the fact that the claims were filed by different state agencies is unavailing, so long as they arise out of the same transactions or occurrences as those giving rise to the litigation for which bankruptcy court jurisdiction is at issue.

The California SBE has the responsibility of collecting many kinds of taxes in California, including the gasoline taxes to support the Fund in this case. However, part of the claims filed by the SBE were explicitly designated as taxes owing under the Underground Storage Tank Maintenance Fee Law, which are imposed to provide the capital for SWRCB. Thus the SBE has filed a claim on behalf of the Fund, and the Fund cannot now complain that this claim was filed by a different agency.

Furthermore, the claims that the State of California has filed in this case are not *de minimis,* and they were not filed by an agency of the state that may not have had before it the whole picture of the debtors' problems with the state. The state tax claims are huge, more than $44 million.[13] They were filed by two of the state's princi-

---

12. *Pochiro* was based on Arizona Rule of Civil Procedure 13(a), which is identical to F.R.Civ.P. 13(a). While the Arizona interpretation of the rule would have governed, the court found the Arizona case law sparse, and applied the federal interpretation of the rule to the case.

13. Apparently the only larger claim in this case is the criminal fine recently imposed on the corporate debtors of $400 million. This claim may be subordinated to the claims of other creditors, pursuant to Bankruptcy Code § 726(a)(4).

pal tax-collection agencies. This statutory waiver of sovereign immunity resulting from the filing of a claim in a bankruptcy case was well known to the State of California when it filed its claims in this case.

### ii. Voluntariness of Filing of Claim

■■■ The SWRCB argues that the filing of a claim cannot be a voluntary waiver of sovereign immunity, because it cannot be the waiver of any right. Forcing the state to choose between waiving its constitutional rights, the state argues, or waiving its substantive claims is not a voluntary choice. The Court finds no merit in this argument.

The SWRCB in this case relies on *Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159 (9th Cir.1986), for its argument that it has not voluntarily consented to the jurisdiction of this Court in consequence of its filing of a proof of claim. In *Castlerock* the creditor had filed a state court action before the bankruptcy case was filed, based on state contract law. This action was stayed by the automatic stay, and the creditor filed a complaint for relief from the stay [14] to proceed with the state court action. The debtor filed a state law counterclaim to the relief from stay complaint. The Ninth Circuit held that the bankruptcy court lacked jurisdiction over the counterclaim, because the counterclaim was filed before the creditor filed its claim in the case. *Id.* at 162–63. The Ninth Circuit found that the subsequent filing of the claim did not retroactively confer jurisdiction on the bankruptcy court with respect to the counterclaim. *Castlerock* gives no assistance to the SWRCB in this case because the state claim in this case was filed long before this adversary proceeding commenced.

Furthermore, several years after *Castlerock* the United States Supreme Court issued its decision in *Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1991), which casts doubt on any restrictive reading of the consent-conferring impact of the filing of a claim in a bankruptcy case. In *Langenkamp* the Supreme Court held that creditors who have filed claims in a bankruptcy case have thereby waived the right to a jury trial in resulting counterclaims to avoid preferential transfers.[15] Relying on the fact that the creditors had filed proofs of claim, the Court held that the creditors had triggered "the process of allowance and disallowance of claims, thereby subjecting [themselves] to the bankruptcy court's equitable power." *Id.* at 44, 111 S.Ct. at 331 (internal quotations deleted).

*Langenkamp* gives a creditor a choice. One alternative is to ignore the bankruptcy case, and thereby to avoid the jurisdiction of the bankruptcy court. In fact, many creditors do not file claims and achieve this result, but probably they do so more because they think that the effort is futile. The second alternative is to file a claim, in order to participate in the fruits of the bankruptcy process, and thereby to submit to the jurisdiction of the bankruptcy court. The fact that a particular creditor finds these choices unattractive does not convert the choice into an involuntary decision: if this were so, many of the choices that people make in many different contexts of life would be "involuntary", and some people could live virtually their entire lives without making any voluntary choices at all. The Court declines to adopt such a cramped view of the voluntary character of human choices.

Case law is in accord with this view. In *995 Fifth Avenue Associates, L.P. v. New York State Department of Taxation & Finance (In re 995 Fifth Avenue Associates, L.P.)*, 963 F.2d 503, 509 (2d Cir.), *cert. denied*, 506 U.S. 947, 113 S.Ct. 395, 121 L.Ed.2d 302 (1992), the Second Circuit found that New York's filing of an administrative claim for capital gains taxes constituted a waiver of its Eleventh Amendment rights

---

14. Prior to 1983, relief from stay was sought by the filing of a complaint, initiating an adversary proceeding in the bankruptcy court. In 1983 the Federal Rules of Bankruptcy Procedure were amended to convert relief from stay proceedings to motions, rather than adversary proceedings. *See* Fed.R.Bankr.P. 4001(a).

15. *See also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58–59, 109 S.Ct. 2782, 2799, 106 L.Ed.2d 26 (1989), where the Supreme Court held that the right to a jury trial was not waived by a party who had not filed a claim in the bankruptcy case.

with respect to a tax refund claim arising out of the same sales transaction.

Similarly, in *WJM, Inc. v. Massachusetts Department of Public Welfare*, 840 F.2d 996, 1002–03 (1st Cir.1988), the First Circuit held that a state that chooses to enter the federal government's exclusive bankruptcy preserve by filing a claim must pay the price of a partial waiver of its sovereign immunity. The court in *WJM* specifically found that choosing between unpalatable alternatives did not render the decision to file a claim any the less voluntary. The court stated:

> [W]e reject the supposition, implicit in [the state's] argument, that a waiver of a constitutional right lacks validity simply because it is the outcome of a "no-win" situation. A decision to forego a constitutional protection is often difficult: the Constitution safeguards important rights. While an effective waiver must be "knowing and intelligent," it may occur even when the waiving party is between a rock and a hard place.... Here, while either choice may have been unpalatable, the DPW had its eyes open when it resolved the dilemma by filing the claims.

*Id.* at 1004–05 (citations omitted).

Similarly, in this case the State of California had its eyes open when it filed its claims for unpaid taxes, especially those supporting the Fund from which the debtor seeks compensation for its cleanup expenses. Accordingly, the Court holds that the FTB's filing of a claim in this case constitutes a waiver of sovereign immunity, to the extent provided in § 106(b).

### iii. Constitutionality of § 106

■ The SWRCB further argues that the Supreme Court's decision in *Seminole* has rendered unconstitutional the entire waiver of sovereign immunity in § 106. The Court finds it unnecessary to address this argument, because it finds on other grounds that the State of California has effectively waived its sovereign immunity with respect to the proceeding before the Court.

It is important to note what *Seminole*'s interpretation of the Eleventh Amendment leaves undisturbed. Section 106 authorizes suits against all "governmental units", as defined in § 101(27).[16] This includes the federal government and its agencies, the states and state agencies, municipalities and municipal agencies,[17] and foreign governments and their agencies. Only the states and their agencies are protected by the Eleventh Amendment, and they are the only beneficiaries of *Seminole*. All other governmental units and agencies remain subject to suit pursuant to § 106. S. Elizabeth Gibson, *Sovereign Immunity in Bankruptcy: the Next Chapter*, 70 AM.BANKR.L.J. 195, 199 (1996). Thus SWRCB's argument is overbroad: *Seminole* only affects the constitutionality of actions against a state or state agency.

### 2. General Appearance

■ It has long been the law that the making of a general appearance in a lawsuit waives all personal jurisdictional objections. *See, e.g., Hankins v. Finnel*, 964 F.2d 853, 856 (8th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). By making a general appearance a party voluntarily submits to the jurisdiction of the court. A state that makes such an appearance waives its Eleventh Amendment rights. *Hankins*, at 856.

■ The State of California has appeared in this case on numerous occasions to protect its secured creditor status in consequence of its tax liens. The Court finds that these numerous appearances constitute a general appearance, that generally waives any sovereign immunity claim that it may have under the Eleventh Amendment.

**16.** The Bankruptcy Code defines a "government unit" in § 101(27):
"Governmental unit" means United States; State ... department, agency or instrumentality of the United States ... a state....
11 U.S.C.A. § 101(27) (West 1994). Therefore, this provision purports to provide for the waiver of sovereign immunity of both the federal and state government.

**17.** *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978). With respect to local governments, the issue is not altogether clear cut. *See generally*, WRIGHT, *supra*, § 3524, at 130–45, and cases cited therein.

### 3. Statutory Waiver

The United States Supreme Court has made it clear that a state may waive its sovereign immunity by statute. *See, e.g., Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145, n. 1, 87 L.Ed.2d 171 (1985); *Hans v. Louisiana,* 134 U.S. 1, 17–18, 10 S.Ct. 504, 508, 33 L.Ed. 842 (1890); *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 380, 5 L.Ed. 257 (1821). Such a waiver must be unequivocal. *Atascadero,* 473 U.S. at 239–40, 105 S.Ct. at 3146; *Welch v. Texas Department of Highways & Public Transportation,* 483 U.S. 468, 473, 107 S.Ct. 2941, 2945–46, 97 L.Ed.2d 389 (1987).

Statutory waiver does not apply in this case. Even though a state may have waived its sovereign immunity to permit a claim against it in state court, this is not enough to waive its Eleventh Amendment immunity. *Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 306, 110 S.Ct. 1868, 1873, 109 L.Ed.2d 264 (1990); *Atascadero,* 473 U.S. at 241, 105 S.Ct. at 3146–47. A state's interest in immunity includes not merely whether it may be sued, but also where it may be sued. *Id.; Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). For a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the state's intention to subject itself to suit in federal court. *Atascadero,* at 241, 105 S.Ct. at 3146–47. California has not met this standard in this case.

### D. Other Grounds for Federal Jurisdiction

In *Seminole* the United States Supreme Court notes two other possible grounds for federal jurisdiction, that are consistent with the Eleventh Amendment. These grounds are the Fourteenth Amendment, adopted nearly a century after the Eleventh Amendment, and the *Ex parte Young* doctrine.

### 1. Fourteenth Amendment

Nearly a century after the adoption of the Eleventh Amendment, the Fourteenth Amendment was adopted to expand federal power at the expense of state autonomy. *Seminole,* at ——, 116 S.Ct. at 1125. This amendment fundamentally altered the balance of state and federal power struck by the Constitution, including that embodied in the Eleventh Amendment. *Id.,* citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–56, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976).

Section 1 of the Fourteenth Amendment contains prohibitions expressly directed at the states, and § 5 of that amendment expressly gives Congress the power to enforce the amendment with appropriate legislation. *Seminole,* —— U.S. at ——, 116 S.Ct. at 1125. Thus, Congress has the power under the Fourteenth Amendment to waive sovereign immunity that is otherwise protected by the Eleventh Amendment. *Id.; Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145–46, 87 L.Ed.2d 171 (1985). To exercise this power, Congress must make unmistakably clear in the statute that it is invoking this power under the Fourteenth Amendment to abrogate the sovereign immunity rights of states under the Eleventh Amendment. *Dellmuth v. Muth,* 491 U.S. 223, 227–28, 109 S.Ct. 2397, 2399–400, 105 L.Ed.2d 181 (1989).

However, neither party before the Court contends that the Fourteenth Amendment provides the grounds for this Court's jurisdiction in this matter, and the Court perceives no such ground on its own.

### 2. Ex Parte Young

The *Ex parte Young* doctrine, on the other hand, is more promising for the trustee. In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the United States Supreme Court held that there was federal jurisdiction over a suit against a state official, where the state itself could not be sued in federal court, when the suit sought only prospective injunctive relief in order to end a continuing violation of federal law. In *Seminole* the Supreme Court reaffirmed the continuing vitality of this rule. *Seminole,* at ——, 116 S.Ct. at 1132. However, the Court found an exception to the rule in *Seminole,* because the statute in that case contained detailed provisions on how a dispute with the state should be resolved. The Court held:

[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*

*Id.* at ——, 116 S.Ct. at 1132. Because of the detailed remedial provisions in the Indian Gaming Regulatory Act in case a state failed to negotiate in good faith, the Supreme Court found that the *Ex parte Young* doctrine was not available for a federal court to compel state officials to comply with the Act.

The case before this Court, in contrast, is quite different from the statute involved in *Seminole.* The statute involved in this case, the Bankruptcy Code, does not contain specific enforcement provision against a state, in case the state does not comply with particular obligations under the Bankruptcy Code. There are very few provisions in the Bankruptcy Code that relate only to state authorities, and none involved in the matter before the Court.

The Supreme Court itself recognized in *Seminole* that this would be the usual situation in the bankruptcy context. In responding to Justice Stevens' criticism that *Seminole* will upset established federal jurisdiction over subjects such as bankruptcy, Justice Rehnquist further stated:

> That conclusion is exaggerated both in its substance and in its significance. First, Justice STEVENS' statement is misleadingly overbroad. We have already seen that several avenues remain open for ensuring state compliance with federal law. See *supra,* at n. 13. Most notably, an individual may obtain injunctive relief under *Ex parte Young* in order to remedy a state officer's ongoing violation of federal law.

*Id.* at —— n. 16, 116 S.Ct. at 1131 n. 16. In footnote 14 Justice Rehnquist further stated for the Court, "an individual can bring suit against a state officer in order to ensure that the officer's conduct is in compliance with federal law [citing *Ex parte Young*] . . . ." *Id.* at ——, 116 S.Ct. at 1131 n. 14.

The principal effect of the *Seminole* decision, in the bankruptcy context, may be to convert litigation against a state, such as the action against the Fund in this case, into litigation against the applicable state officers. A large number of state officials could suddenly find themselves as defendants in a very large number of lawsuits. Such a development would give new meaning to the phrase "public servant". States should think long and hard about whether they want to precipitate *Ex parte Young* litigation against their officials, including a number at relatively low levels, before they invoke the Eleventh Amendment sovereign immunity in bankruptcy cases.

While the trustee has not invoked *Ex parte Young* in this case, it appears that this could provide a possible basis for this Court's jurisdiction (after suitable amendment of the pleadings), absent any other viable ground for bankruptcy court jurisdiction.

If it were necessary for the trustee to invoke *Ex parte Young* and bring this action against a state official, this Court would hold up any decision to abstain or to remand to state court until the trustee had an opportunity to address this procedural problem. However, the Court sees no need to invoke *Ex parte Young,* because it finds other adequate grounds for bankruptcy court jurisdiction in this matter.

## V. CONCLUSION

The Court concludes that the state's motion to remand this proceeding to state court must be denied. The police power disqualification for removal does not apply, because the removed action is not an action *by* the state, and it does not involve the exercise of its police or regulatory power. This proceeding is not subject to mandatory abstention, because it involves a core proceeding under the Bankruptcy Code, and it does not raise purely state law questions. The factors relevant to discretionary abstention weigh substantially against such abstention, and equitable grounds also weigh substantially in favor of denying the motion.

Finally, the Eleventh Amendment does not deny this Court jurisdiction to hear this proceeding, because the state has waived its sovereign immunity rights thereunder in two

respects. First, it has filed claims that are logically related to this proceeding such that this arises out of the same transaction or occurrence, within the meaning of § 106(b). Second, the state has made a general appearance in this case, which waives its right to object to personal jurisdiction over it based on the Eleventh Amendment.

The Court sets a further hearing on this proceeding on September 19, 1996 at 3:00 p.m. At that time it will schedule argument on the merits of the administrative mandamus proceeding.